1

DAVID B. FARKAS (SBN 257137)
david.farkas@dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: (310) 595-3000
Fax: (310) 595-3300

JOHN K. LYONS (*Pro Hac Vice*)
john.lyons@dlapiper.com
JEFFREY S. TOROSIAN (*Pro Hac Vice*)
jeffrey.torosian@dlapiper.com
JOSEPH A. ROSELIUS (*Pro Hac Vice*)
joseph.roselius@dlapiper.com
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516

Attorneys for Jonathan D. King
as Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>ZETTA JET USA, INC., a California corporation,<br><br>     Debtor. | Lead Case No.: 2:17-bk-21386-SK<br><br>Chapter 7<br><br>Jointly Administered With:<br>Case No.: 2:17-bk-21387-SK |
| In re:<br><br>ZETTA JET PTE, LTD., a Singaporean corporation,<br><br>     Debtor. | **CHAPTER 7 TRUSTEE'S MOTION FOR AN ORDER SUBSTANTIVELY CONSOLIDATING THE BANKRUPTCY ESTATE OF ZETTA JET PTE, LTD WITH DRAGON PEARL LIMITED** |
| ☐    Affects Both Debtors<br>☐    Affects Zetta Jet USA, Inc., a California corporation, only<br>☒    Affects Zetta Jet PTE, Ltd., a Singaporean corporation, only | Hearing Date:<br>Date:  May 19, 2021<br>Time:  9:00 a.m. (PDT)<br>Place:  Courtroom 1575<br>      255 East Temple Street<br>      Los Angeles, CA 90012 |

DLA PIPER LLP (US)
LOS ANGELES

EAST\180177098.9

1

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, ALL CREDITORS, AND DRAGON PEARL LIMITED:**

Jonathan D. King, solely in his capacity as the duly appointed chapter 7 trustee (the "Trustee") in the above-captioned, jointly administered bankruptcy cases (the "Chapter 7 Cases") of Zetta Jet USA, Inc. ("Zetta USA") and Zetta Jet PTE, Ltd. ("Zetta PTE" and together with Zetta USA, the "Debtors"), by and through his undersigned counsel, hereby moves (the "Motion") this Court for entry of an order, pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code"), rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and rule 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, substantively consolidating the bankruptcy estate of Zetta PTE with defendant Dragon Pearl Limited ("DPL"). In support of this Motion, the Trustee relies on the *Declaration of Luke Furler* (the "Furler Declaration"), attached as **Exhibit 1**, and respectfully states as follows:

## I.  Introduction

1.  On October 29, 2018, the Trustee filed a complaint commencing the adversary proceeding *Jonathan King, Solely in his Capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd. v. New Target Investments Limited et al.* (the "New Target Adversary Proceeding") in the above chapter 7 cases.

2.  On September 13, 2019, the Trustee filed an amended complaint (the "Amended Complaint") against Kebo Wu ("Wu"), New Target Investments Limited ("New Target"), Linkage Access Limited ("Linkage") and DPL alleging claims relating to the Dragon Pearl, a 70-foot luxury yacht that Geoffrey Cassidy ("Cassidy"), Zetta PTE's[1] former managing director, purchased using US$3,594,481.34 (as of the Petition Date) of Debtor Zetta PTE's funds within two years of the Petition Date. [New Target Adversary Proceeding Docket No. 60].

3.  Each of the Defendants was properly served. None of the Defendants responded to the Amended Complaint. The Clerk entered default against New Target on December 20, 2019

---

[1] Capitalized terms not otherwise defined herein are defined as in the Amended Complaint.

[New Target Adversary Proceeding Docket No. 88].  The Clerk entered default against Linkage on December 20, 2019. [New Target Adversary Proceeding Docket No. 89].  The Clerk entered default against DPL on February 6, 2020. [New Target Adversary Proceeding Docket No. 103].  The Clerk entered default against Wu on August 17, 2020.  [New Target Adversary Proceeding Docket No. 142].

4.    On February 11, 2021, the Trustee filed the *Trustee's Motion for Default Judgment Against New Target Investments Limited, Linkage Access Limited, Dragon Pearl Limited, and Kebu Wu and Memorandum of Points and Authorities in Support Thereof* [New Target Adversary Proceeding Docket No. 161] (the "Default Judgment Motion").

5.    On March 26, 2021, the Trustee filed the *Chapter 7 Trustee's Motion for Adjournment* [New Target Adversary Proceeding Docket No. 173] (the "Continuance Motion"), which sought to adjourn the March 31, 2021 hearing on the Default Judgment Motion in order to allow time to file and hear this Motion.

6.    On March 31, 2020, the Court held a status conference and hearing on the Default Judgment Motion and, on April 5, 2021, entered a scheduling order continuing the hearing on the Default Judgment Motion and the Continuance Motion to May 19, 2021 [New Target Adversary Proceeding Docket No. 180].

7.    As noted in the Default Judgment Motion, the Trustee files this Motion to substantively consolidate the Zetta PTE estate with the DPL estate which will further support entry of judgments sought in the Default Judgment Motion.[2]

8.    At the core of New Target Adversary Proceeding is the self-dealing, fraud, and embezzlement committed by Cassidy, the Debtors' former managing director.  One of Cassidy's multi-million-dollar thefts from Zetta PTE involved the creation of DPL, a thinly capitalized Marshall Islands holding company, which served as an alter ego of Cassidy and Zetta PTE (through Cassidy's control).  Cassidy used DPL to conceal his misappropriation of AU$4,492,034.82 of Zetta PTE's funds which he used to purchase the Dragon Pearl, a 70-foot luxury yacht, for his own

---

[2] *See* Default Judgment Motion, note 5 (reserving the Trustee's right to assert additional grounds to seek entry of default, including substantive consolidation of Zetta PTE and DPL as of the Petition Date).

benefit.

9.      Through DPL, Cassidy orchestrated a series of transactions designed to conceal his theft.  First, he wrongfully titled the Dragon Pearl in DPL, although he used Zetta funds to purchase the yacht, used Zetta employees to maintain and operate the yacht, put the yacht on Zetta's insurance policy, and maintained expense records relating to the yacht on Zetta PTE's books and records by Zetta PTE's accounting staff.  All of the expenses incurred in the operation of, and all of the suppliers and vendors that provided goods and services in connection with, the Dragon Pearl were paid by Zetta PTE.  As of the Petition Date, DPL had no employees, no directors other than Cassidy, had no assets other than the Dragon Pearl, and had no shareholders other than Cassidy.  It was simply a shell created by Cassidy to conceal the Dragon Pearl from Zetta PTE's other shareholders and creditors.

10.      Immediately after Zetta PTE filed its chapter 11 petition, Cassidy transferred his shares in DPL to Du Yan ("Du"), the nominee of New Target and Wu, to place the Dragon Pearl beyond the reach of Zetta PTE's creditors.  Du even conceded to being a nominee of New Target for Wu, and acknowledged in an affidavit that she held the shares of DPL solely to insulate her friend.

11.      Wu had just been defrauded by Cassidy one month earlier, was obviously not pleased, and was exercising self-help to recover his money paid to Zetta PTE ahead of the Debtors' other creditors and in violation of the automatic stay.  Wu, and through him, all of the defendants in the New Target Adversary Proceeding (the "New Target Defendants")—which he controlled— were fully aware of the bankruptcy, the Dragon Pearl theft (including all of the facts set forth in the preceding paragraphs) and the applicability of the automatic stay, but continued to thwart the Trustee's efforts at every turn to recover the Dragon Pearl for the benefit of all creditors of the estates.

12.      To that end, after the Trustee's attempt to arrest the Dragon Pearl was defeated in Australia (due to the failure of a key witness to show up at the arrest proceeding to testify), Wu directed Du to transfer title to Linkage in June 2018.  Rather than turn over the Dragon Pearl to the Trustee, Wu engaged in protracted litigation to block the Trustee's recovery of the Dragon Pearl,

1    causing the expenditure of significant estate resources.

2        13.    Eventually, Wu's efforts to gain control of the Dragon Pearl failed when, on

3    February 7, 2019, the Australian Federal Police seized the Dragon Pearl based upon an order issued

4    by the United States District Court for the Central District of California based upon a probable

5    cause warrant executed by the Federal Bureau of Investigation that the Dragon Pearl was the

6    product of Cassidy's mail and wire fraud.

7        14.    Through this motion, the Trustee seeks to substantively consolidate the bankruptcy

8    estate of Zetta PTE with DPL.  As explained herein, substantive consolidation is justified because

9    it will greatly benefit Zetta PTE's bankruptcy estate and all of its creditors and will not in any way

10   prejudice DPL's creditors (because none exist).  By consolidating the estates, the Trustee will

11   obtain a further ground to support a judgment against DPL and the Wu Defendants under Sections

12   549 and 550 of the Bankruptcy Code for the unauthorized postpetition transfer of the Dragon Pearl

13   and similarly provide additional support for entry of a compensatory civil contempt award under

14   Section 362 of the Bankruptcy Code against the Wu Defendants for their continued violations of

15   the automatic stay.

16   **II.    JURISDICTION AND VENUE**

17       15.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

18       16.    This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

19       17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

20       18.    Statutory authority for the relief sought herein is 11 U.S.C. § 105(a).

21   **III.    RELEVANT FACTS**

22   **A. General and Procedural Background**

23       19.    On September 15, 2017 (the "<u>Petition Date</u>"), the Debtors commenced these

24   bankruptcy cases by filing in this Court voluntary petitions for relief under chapter 11 of the

25   Bankruptcy Code. [Docket No. 1].

26       20.    On December 4, 2017, this Court converted the Debtors' chapter 11 cases to cases

27   under chapter 7 of the Bankruptcy Code [Docket No. 452 for Zetta USA and Docket No. 52 for

28   Zetta PTE].

DLA PIPER LLP (US)
LOS ANGELES

EAST\180177098.9

21.     On December 5, 2017, the *Notice of Appointment of Trustee and Fixing of Bond* was filed, which reflected the U.S. Trustee's appointment of Mr. King to serve as the chapter 7 interim trustee in these chapter 7 cases [Docket No. 458 for Zetta USA and Docket No. 53 for Zetta PTE]. Mr. King later became the permanent chapter 7 trustee in these chapter 7 cases.

**B.  Motion Background**

  **i.  Cassidy uses Zetta PTE funds to purchase the Dragon Pearl, but titles it in the name of DPL.**

22.     Between April 18, 2016, and December 16, 2016, Cassidy caused Zetta PTE to make transfers to Maritimo Offshore Pty Ltd. ("Maritimo"), an Australian luxury yacht manufacturer, in the amount of AU$4,492,034.82 for the purchase of the Dragon Pearl.[3] (Furler Decl. ¶ 9.)

23.     On or about July 28, 2016, Cassidy formed DPL as an offshore holding company to hold the title to the Dragon Pearl, its only asset. (Furler Decl. ¶ 10.)  Cassidy used Zetta PTE's funds and counsel, Salem Ibrahim, to form DPL. *Id.*  DPL's only purpose was to maintain and operate the Dragon Pearl.  At all material times until about September 28, 2017, Cassidy was the sole director and shareholder of DPL. (Furler Decl. ¶ 10).  A DPL Consent of Incorporator is attached to the Furler Declaration as **Exhibit A**, and a Resolution dated September 28, 2017 indicating Cassidy as sole shareholder cancelled 500 shares in exchange for issuance of one share to Du is attached to the Furler Declaration as **Exhibit B**.  DPL had no retained earnings, no operations, and could not pay dividends. (Furler Decl ¶ 10.)

24.     Cassidy also signed employment agreements on behalf of Zetta PTE to employ the crew for the Dragon Pearl and caused Zetta PTE to pay their salaries, even though the employees were not involved in any of Zetta PTE's other operations. (Furler Decl. ¶ 11.)  The Dragon Pearl crew were provided "@zettajet" email addresses.  Cassidy used Zetta PTE funds to pay Philippe Crevier Services Conseils Inc./Philippe Crevier Consulting Services Inc. ("Philippe Crevier") to

---

[3] To pay for the Dragon Pearl, Cassidy caused Zetta PTE to make the following payments (collectively, the "Transfers") to Maritimo between April 18, 2016 and December 16, 2016: (a) on April 18, 2016, Zetta PTE paid AUD $20,000; (b) on May 24, 2016, Zetta PTE paid AUD $549,018.87; (c) on August 12, 2016, Zetta PTE paid AUD $910,031.45; (d) on September 27, 2016, Zetta PTE paid AUD $910,031.45; and (e) on December 16, 2016, Zetta PTE paid AUD $2,102,953.05. (Furler Decl. ¶ 9 note 1.)  Thus, Zetta PTE paid for the Dragon Pearl, and they paid dearly: the total price paid by Zetta PTE for the Dragon Pearl was AU$4,492,034.82 (or approximately US$3,594,481.34 as of the Petition Date). (Furler Decl. ¶ 9.)

1    manage the Dragon Pearl. (Furler Decl. ¶ 11.)

2        25.    On or about December 5, 2016 (exactly one year before the Trustee was appointed

3    to oversee the liquidation of the Debtors' estates), Maritimo transferred ownership and possession

4    of the Dragon Pearl to DPL. (Furler Decl. ¶ 12.)  On the same day, DPL became the registered

5    owner of the Dragon Pearl under the laws of the Marshall Islands. At all times, the sole purported

6    asset of DPL was the Dragon Pearl. (Furler Decl. ¶ 12.)

7        26.    The additional incontrovertible facts demonstrate that DPL was an alter ego of

8    Cassidy and Zetta PTE (through Cassidy's exclusive control in Singapore).  Among other things:

9        •   With respect to Zetta PTE, Cassidy was its CEO and controlled all of its cash and

10           financial reporting.  Among other things, Cassidy had authority over Zetta PTE's

11           bank accounts which, like Cassidy himself, were located in Singapore.  All of Zetta

12           PTE's accounting and financial staff reported to Cassidy.

13       •   Cassidy and his wife, Miranda June Tang Kim Choo, had authority to approve all

14           wire transfers from Zetta PTE's bank accounts.

15       •   Cassidy paid Philippe Crevier with Zetta PTE funds to manage the Dragon Pearl.

16       •   Cassidy insured the Dragon Pearl with Zetta PTE's insurance policy and paid

17           additional premiums for such coverage.

18       •   DPL's books and records were maintained as a Zetta PTE subaccount within Zetta

19           Jet PTE's books and records, so it has no financial records separate from those of

20           Zetta PTE.

21       •   The DPL subaccount indicated that all of the expenses incurred to operate the

22           Dragon Pearl, such as fuel charges, wifi charges, iPad charges, crew expenses, crew

23           medical insurance, AMEX charges, freight charges, photoshoot, berthing fees, port

24           charges, cruising permits, water and electricity charges, were paid by Zetta PTE.

25       •   Since Cassidy controlled Zetta PTE's bank accounts and accounting staff to make

26           payments on DPL's behalf, Cassidy similarly controlled DPL.

27       •   DPL and Zetta PTE, acting wrongfully through Cassidy, engaged in a scheme to

28           abscond with the Dragon Pearl and their conduct resulted in injustice to Zetta PTE

DLA PIPER LLP (US)
LOS ANGELES

1    and its legitimate creditors.

2    • DPL and Zetta PTE, acting wrongfully through Cassidy, did not act with one another

3    at arm's length but instead worked in concert to conceal the ownership of the Dragon

4    Pearl and place the Dragon Pearl beyond the reach of creditors of the Debtors.

5    Furler Decl. ¶ 13.

6    **ii.    Cassidy enters into the Falconwing transaction with Wu.**

7    27.    On August 10, 2017, Cassidy caused the Debtors to purchase a jet from Wu and

8    Canning Fok ("Fok") for $5.5 million in exchange for "block hours" that Fok, Wu, and New Target

9    could redeem for flight time on the Debtors' private luxury jet aircraft fleet. (Furler Decl. ¶ 14.)  At

10    the same time, Cassidy extended personal guarantees to each of Fok, Wu, and New Target, under

11    which he guaranteed Zetta PTE's performance on the "block hours." (Furler Decl. ¶ 14.)

12    **iii.    The Debtors suspend and remove Cassidy, and file for bankruptcy.**

13    28.    On August 17, 2017 – the same day Cassidy executed the personal guarantees and

14    the block hour agreements in the Falconwing transaction – the board of directors of Zetta PTE voted

15    to remove Cassidy from all positions he held within the Debtors. (Furler Decl. ¶ 15.)  Five days

16    later, on August 22, 2017, Cassidy was removed as director of Zetta PTE. (Furler Decl. ¶ 15.)  The

17    Debtors filed for bankruptcy on September 15, 2017.  (Furler Decl. ¶ 15.)

18    29.    New Target filed its appearance in the Chapter 11 Cases on September 27, 2017.

19    The Debtors' filings during the 12 days between commencement of the Chapter 11 Cases and the

20    date of New Target's appearance were replete with allegations about Cassidy's fraud in general,

21    and his misappropriations related to the Dragon Pearl in particular – and also specifically mentioned

22    a lawsuit the Debtors had filed in this District on September 8, 2017, which alleged that Cassidy

23    used the Debtors' funds to purchase the Dragon Pearl.  New Target thus had actual or constructive

24    knowledge that Cassidy purchased the Dragon Pearl with misappropriated Zetta PTE funds and

25    was thus an asset of the Debtors protected by the imposition of the automatic stay. (Furler Decl. ¶

26    16.)

27

28

DLA PIPER LLP (US)
LOS ANGELES

8

iv.     **Post-petition, Cassidy transferred control over the Dragon Pearl to New Target, which transferred it to Linkage.**

30.     On or after September 28, 2017, Cassidy transferred all of the issued and outstanding equity of DPL (and thereby, the Dragon Pearl, its sole asset) to Du, New Target's nominee, for US$1.00, which enabled New Target and Wu (who controlled New Target) to take indirect ownership of the Dragon Pearl (the "DPL Transfer").  The DPL transfer allowed Cassidy to satisfy the personal guaranty that Cassidy issued to Wu for the block hours issued in the Falconwing transaction.  Thus, Cassidy issued Wu block hours, then when Wu demanded that he be made whole on the block hours, Cassidy gave Wu the Dragon Pearl, which Wu knew had been purchased by Cassidy with stolen funds from Zetta PTE.  The portion of this scheme done after the Petition Date was done with full knowledge of the bankruptcy cases by New Target and Wu, to the detriment of other creditors. (Furler Decl. ¶ 17.)

31.     Thereafter, on June 8, 2018, Du, at the direction of New Target, caused DPL to transfer the Dragon Pearl to Linkage for US$1.00, which enabled Wu to retain ownership of the Dragon Pearl (the "Linkage Transfer", and together with the DPL Transfer, the "Post-Petition Transfers"). (Furler Decl. ¶ 18.)

32.     Neither of the Post-Petition Transfers were legitimate, arm's-length transactions for value made in good faith. The Defendants undertook the Post-Petition Transfers in bad faith, with full and actual knowledge that the Trustee had both legal and equitable interests in the Dragon Pearl under 11 U.S.C. § 541.  The Post-Petition Transfers were not authorized by the Court and made in violation of the automatic stay.

IV.    **ARGUMENT**

A.     **The Court should substantively consolidate Zetta PTE and DPL because (i) DPL had no separate existence from Zetta PTE and (ii) existed solely to defraud creditors.**

33.     Here, the Court should substantively consolidate debtor Zetta PTE with DPL, since DPL was set up as a mere conduit in Cassidy's shell game to place the Dragon Pearl beyond the reach of the Trustee, Zetta PTE, and Zetta PTE's legitimate creditors.

34.     The primary purpose of a bankruptcy court's power to order substantive

DLA Piper LLP (US)
Los Angeles

9

1    consolidation "is to ensure equitable treatment of all creditors." *Alexander v. Compton (In re*

2    *Bonham)*, 229 F.3d 750, 764 (9th Cir. 2000). Without the check of substantive consolidation,

3    "debtors could insulate money through transfers among inter-company shell corporations with

4    impunity." *Id*. A bankruptcy court has "the power to enter [a] substantive consolidation order"

5    because "courts of bankruptcy are essentially courts of equity, and their proceedings inherently

6    proceedings in equity." *Id.* at 763 (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)). Indeed

7    "[t]he bankruptcy court's power of substantive consolidation has been considered part of the

8    bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898." *Id*.

9    "At present, consistent with its historical roots, the power of substantive consolidation derives from

10   the bankruptcy court's general equity powers as expressed in § 105 of the Bankruptcy Code." *Id.*

11   at 764.

12       35.    In furtherance of equitable treatment of creditors, "[o]rders of substantive

13   consolidation combine the assets and liabilities of separate and distinct – but related – legal entities

14   into a single pool and treat them as though they belong to a single entity." *Id.* "Substantive

15   consolidation 'enable[es] a bankruptcy court to disregard separate corporate entities, to pierce their

16   corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a

17   related corporation.'" *Id.* (quoting *James Talcott, Inc. v. Wharton (In re Continental Vending*

18   *Machine Corp.)*, 517 F.2d 997, 1000 (2d Cir. 1975)). "It is available in bankruptcy courts as an

19   alternative to remedy the harms caused by debtors and entities they control who disregard

20   separateness." *Clark's Crystal Springs Ranch, LLC v. Gugino (In re Clark)*, 548 B.R. 246, 253

21   (9th Cir. BAP 2016). Courts permit the substantive consolidation of non-debtor entities with debtor

22   entities "in furtherance of the equitable goals of substantive consolidation." *In re Bonham*, 229

23   F.3d at 765.

24       36.    In considering whether substantive consolidation is proper, the Ninth Circuit has

25   adopted the test set forth by the Second Circuit in *In re Augie/Restivo*, 860 F.2d 515 (2d Cir. 1988).

26   *See Bonham*, 229 F.3d at 766. Under the *Augie/Restivo* test, courts consider "(1) whether creditors

27   dealt with the entities as a single economic unit and did not rely on their separate identity in

28   extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will

DLA PIPER LLP (US)
LOS ANGELES

10

EAST\180177098.9

Case 2:17-bk-21386-SK    Doc 1464    Filed 04/28/21    Entered 04/28/21 22:46:37    Desc
Main Document    Page 11 of 16


1    benefit all creditors." *Id.* at 766.  Either is sufficient to order substantive consolidation.  *Id.*

2    37.    The first test, reliance on credit of the separate entity, "is based on the consideration

3    that lenders structure their loans according to their expectations regarding th[e] borrower and do

4    not anticipate either having the assets of a more sound company available in the case of insolvency

5    or having the creditors of a less sound debtor compete for the borrower's assets." *Id.*

6    38.    Regarding the first test, virtually no creditors relied on DPL to extend credit.  In fact,

7    no significant creditor even knew DPL existed other than Cassidy, his lawyer and Maritimo which

8    was paid over $3.6 million by Zetta PTE and was not DPL's creditor.  The Dragon Pearl's crew

9    had contracts with Zetta PTE, were given "@zettajet" email addresses, and Crevier, the Dragon

10   Pearl's manager, had a consulting contract with Zetta PTE.  The vast majority of Dragon Pearl's

11   operating expenses were invoiced to, and all were paid directly by, Zetta PTE.  The few actually

12   invoiced to DPL copied Zetta PTE for payment. (Furler Decl. ¶ 11.)  The Trustee is not aware that

13   DPL had any creditors, other than the New Target Defendants by reason of Cassidy's stay violation.

14   39.    Because no creditor relied on the separate identity of DPL in extending credit, and

15   instead only relied on Zetta PTE as a single economic unit, the first test is met.

16   40.    The second test is known as the "entanglement" test, and it allows for substantive

17   consolidation when (i) there was a unity of interest and common ownership between the entities,

18   (ii) there was commingling of assets and no clear demarcation between the affairs of the entities,

19   and (iii) adhering to the separateness of the corporate entities would result in an injustice to

20   creditors.  *Sharp v. Salyer (In re SK Foods, LP)*, 499 B.R. 809, 833 (Bankr. E.D. Cal. 2013)

21   (describing "entanglement" as effectively the traditional "alter ego" test) (citing *Bonham*).

22   41.    Here, the second test is satisfied.  First, Cassidy controlled both DPL and Zetta PTE.

23   (Furler Decl. ¶¶ 13).  Second, DPL had no existence separate from Zetta PTE.  DPL's only function

24   was holding title to the Dragon Pearl.  (Furler Decl. ¶ 10.).  DPL had no independent employees,

25   business operations, financial records, or financial resources of its own; Cassidy used Zetta PTE to

26   sign and make all payments related to the operation of the Dragon Pearl, including the staff of the

27   Dragon Pearl and the management services provided by Philippe Crevier.  (Furler Decl. ¶¶ 11.).  In

28   effect, there was a complete disregard of corporate separateness between DPL and Zetta PTE, both

LOS ANGELES

11

EAST\180177098.9

1    operationally and financially.

2    42.    Third, the separateness of the entities was a legal fiction to facilitate Cassidy's fraud

3    against the creditors of Zetta PTE.  Cassidy created DPL for the sole purpose of facilitating his

4    fraud against Zetta PTE's creditors, using Zetta PTE's funds to purchase and operate the Dragon

5    Pearl for his own benefit, and then using DPL to hold title to vessel so it would be out of creditors'

6    reach. (Furler Decl. ¶ 13).  Substantive consolidation will help facilitate the Trustee's recovery of

7    the Dragon Pearl for the benefit of Zetta PTE's creditors, and enforcement of judgments against

8    the New Target Defendants who participated with Cassidy in placing the Dragon Pearl beyond the

9    reach of the estates, while adhering to corporate separateness would only help facilitate Cassidy's

10   fraud and leave the estates without any meaningful remedy.

11   43.    Finally, the Ninth Circuit noted that courts often analyze the benefits of substantive

12   consolidation against the harms it would cause.  *In re Bonham*, 229 F.3d at 765.  Here, the balance

13   of the equities wholly supports substantive consolidation.  DPL does not have any independent

14   creditors, so the benefits of substantive consolidation will greatly outweigh any burden to Cassidy

15   and his conspirators.  *See Owner Management Service*, 530 B.R. at 740 ("Defendant's own

16   undisputed evidence of few additional creditors confirms that substantive consolidation will benefit

17   the estate without any substantial burden.").  As the Ninth Circuit stated in *Bonham*, "the only

18   'harm' is that third parties may have greater exposure to risk because they may lose a legal defense

19   to what would otherwise be viable claims of fraudulent transfer.  In short, the alleged 'harm' is that

20   fraudulent transfers of money will be recovered, the estates will be equitably administered and the

21   assets equitably distributed." *In re Bonham*, 229 F.3d at 767.

22   44.    Numerous courts in this jurisdiction have substantively consolidated debtor and

23   non-debtor estates for the benefit of creditors.  *See, e.g., In re Bonham* (affirming bankruptcy

24   court's substantive consolidation of an individual debtor's estate and two of the individual's

25   business entities); *Bank of America, N.A. v. CD-04, Inc. (In re Owner Management Service, LLC

26   Trustee Corps)*, 530 B.R. 711 (Bankr. C.D. Cal. 2015) (substantively consolidating estates of

27   debtors with related non-debtor individuals); *In re Clark*, 548 B.R. 246 (substantively consolidating

28   the individual debtor's estate with a limited liability company and family trust formed by the

DLA PIPER LLP (US)
LOS ANGELES

1   debtor); *Simantob v. Lahijani (In re Lahijani)*, No. 02-01797, 2005 WL 4658490 (Bank. C.D. Cal.

2   Oct. 3, 2005) (substantively consolidating individual debtor's estate with two non-debtor

3   corporations, one created pre-petition and one created after the filing); *Kismet Acquisition, LLC v.*

4   *Icenhower (In re Icenhower)*, 757 F.3d 1044 (9th Cir. 2014) (affirming bankruptcy court's

5   substantive consolidation of individual debtors' estates with their non-debtor "alter ego" business

6   entity).

7           **B.      The Court should order substantive consolidation nunc pro tunc to the
                       Petition Date.**

8

9           45.     Under Ninth Circuit law, it is within the "discretion of the bankruptcy court to

10  determine, in light of the equitable nature of substantive consolidation, whether nunc pro tunc

11  consolidation should be ordered."  *In re Bonham*, 229 F.3d at 771.  Courts commonly hold that

12  nunc pro tunc consolidation is appropriate where the assets of the debtor and non-debtor are

13  essentially identical.  *See, e.g.*, *In re Icenhower*, 757 F.3d at 1049 (affirming a bankruptcy court

14  order substantively consolidating a debtor with a non-debtor nunc pro tunc to the petition date and

15  finding an unauthorized post-petition transfer of estate property by the non-debtor under section

16  549 of the Bankruptcy Code); *In re Lahijani*, 2005 WL 4658490 at *11 (ordering consolidation

17  nunc pro tunc where the debtor treated the non-debtor's "only asset as his own at all applicable

18  times"); *Luxury Jewels, LLC v. Gregory A. Akers (In re Aroonsakool)*, No. SC-13-1206, 2014 WL

19  1273696, at *9 (B.A.P. 9th Cir. 2014) (finding that the bankruptcy court's "legal conclusion that

20  application of substantive consolidation doctrine nunc pro tunc was warranted because the assets

21  of debtors [and non-debtors] are substantially the same.").

22          46.     The Ninth Circuit's ruling in *Icenhower* involved similar circumstances to those at

23  issue here.  In that case, the debtors purchased a Mexican shell company, H&G, which they barely

24  capitalized and into which they transferred a Mexican land ownership interest, essentially its only

25  asset.  *In re Icenhower*, 757 F.3d at 1048.  They subsequently filed for bankruptcy.  *Id.*  One of the

26  debtors, Mr. Icenhower, controlled H&G through a nominee, Kelley, whom he directed to sell the

27  land interest on behalf of H&G to purchasers after the filing.  *Id.*  The bankruptcy trustee

28  successfully obtained judgment against the purchasers (who were aware of the bankruptcy and Mr.

1   Icenhower's other machinations) under section 549 of the Bankruptcy Code, an unauthorized

2   postpetition transfers of estate property. *Id.* at 1049. To reach this result, the bankruptcy court

3   entered an order that substantively consolidated the H&G estate (which was a shell alter ego) into

4   the debtors' estates nunc pro tunc as of the petition date. *Id.* Following entry of the order, all of

5   the property of the H&G estate became property of the bankruptcy estate through the combination

6   of both estates. Thus, the transfer of the H&G property postpetition violated Section 549 and

7   subjected the purchasers to a monetary judgment in the amount of the value of the property.

8       47.    Here, Cassidy used a thinly capitalized shell company, DPL, to hold title to the

9   Dragon Pearl, which was purchased with misappropriated Zetta PTE's funds. After the Petition

10  Date, Cassidy transferred control of DPL to Du Yan who, in turn, and with full knowledge of the

11  Dragon Pearl theft and the bankruptcy cases, transferred the Dragon Pearl to Linkage, one of the

12  New Target Defendants and an affiliate of Wu, her friend. By entering an order of substantive

13  consolidation of the DPL and Zetta PTE estates nunc pro tunc to the Petition Date, the Court will

14  be able to avoid DPL's postpetition transfer of the Dragon Pearl to Linkage under Section 549 of

15  the Bankruptcy Code on the same basis that the Ninth Circuit affirmed the bankruptcy court's

16  avoidance of H&G's transfer of the real property to the purchasers in *Icenhower.*

17      48.    Substantive consolidation nunc pro tunc to the Petition Date is well settled in the

18  Ninth Circuit in circumstances presented here. "[B]ankruptcy courts have sanctioned the

19  substantive consolidation of two or more entities nunc pro tunc in order to allow a trustee or

20  creditors to attack fraudulent transfers or avoidable preferences made by the debtor or consolidated

21  entities as of the date of filing of the initial bankruptcy petition." *Bonham*, 229 F.3d at 765. *See*

22  *also SK Foods*, 499 B.R. at 843 ("[S]ubstantive consolidation *nunc pro tunc* may be proper even if

23  the target entity has no assets to pool and the primary motivation is to allow the trustee to pursue

24  avoidance actions."). Here, the Dragon Pearl was transferred by DPL to Linkage after Zetta PTE

25  entered into bankruptcy, with complete contempt for the automatic stay. (Furler Decl. ¶ 18.)

26  Substantive consolidation will allow the Trustee to recover the Dragon Pearl by pursuing an

27  avoidance action against the New Target Defendants, and the Trustee respectfully requests that the

28  Court also preserve his avoidance and recovery powers for DPL under the Bankruptcy Code

DLA PIPER LLP (US)
LOS ANGELES

EAST\180177098.9

1    following substantive consolidation.

2        49.    The Supreme Court's holding in *Roman Catholic Archdiocese of San Juan, Puerto

3    Rico v. Acevedo*, 140 S.Ct. 696 (2020) ("*Acevedo*") is no barrier to consolidating DPL nunc pro

4    tunc to the Petition Date and does not modify the Ninth Circuit's controlling precedent in *Bonham*

5    and *Icenhower* in the context of substantive consolidation.  In *Acevedo*, the Puerto Rico Court of

6    First Instance had issued payment and seizure orders after a proceeding was removed to federal

7    district court, but before the federal court remanded the case back to the Puerto Rico court.  When

8    the federal court later remanded the case to the Court of First Instance it issued the order nunc pro

9    tunc, so that the order would be effective prior to the issuance of the payment and seizure orders.

10        50.    The Supreme Court ruled that the payment and seizure orders were nonetheless void.

11    It ruled that federal courts may issue nunc pro tunc orders to "reflect the reality of what has already

12    occurred." *Id.* at 700-01 (*citing Missouri v. Jenkins*, 495 U.S. 33, 49 (1990)).  Such orders are not

13    an "Orwellian vehicle for revisionist history—creating 'facts' that never occurred in fact." *Id.*

14    (*citing United States v. Gillespie*, 666 F. Supp. 1137, 1139 (N.D. Ill. 1987).  The Court noted the

15    plain language of the removal statute, which provided that, once a removal notice is filed, "the State

16    court shall proceed no further unless and until the case is remanded." *Id.* at 700 (*quoting* 28 U.S.C.

17    § 1446(d)); *see also In re Merriman*, 616 B.R. 381, 393 (B.A.P. 9th Cir. 2020) (finding that *Acevedo*

18    did not prevent the court from retroactively lifting the automatic stay and noting that the removal

19    statute at issue in *Acevedo* explicitly prohibits state court jurisdiction over a removed action).

20        51.    Here, a nunc pro tunc substantive consolidation order would merely "reflect the

21    reality of what has already occurred"—that, as of the Petition Date, DPL was an alter ego of Zetta

22    PTE that Cassidy created to defraud creditors for his own benefit.  No "fact that never occurred in

23    fact" would be created, as DPL's sole asset—the Dragon Pearl—is properly considered property of

24    Zetta PTE's estate, and a nunc pro tunc consolidation order would therefore accurately reflect the

25    reality of what occurred.

26    **C.**    **The Trustee Has Provided Appropriate Notice to Creditors of Non-Debtor Entities**

27

28        52.    Moreover, the Trustee's Motion is an appropriate procedural method to obtain

1  substantive consolidation.  As the Ninth Circuit stated in *Bonham*, "a bankruptcy court may order

2  substantive consolidation as a contested matter upon motion by the involved parties, as was done

3  in the instant appeal, or via an adversary proceeding or other procedural device, as long as there is

4  notice an opportunity to be heard."  *Bonham*, 229 F.3d at 765 n. 9.

5    53.    Here, the Trustee is providing sufficient notice to DPL through service on the New

6  Target Defendants.  As noted above, the Trustee is unaware of any creditors of DPL other than the

7  New Target Defendants.  Out of an abundance of caution, the Trustee is also serving the invoice

8  parties of service providers and crew members (if available) who provided goods or services with

9  respect to the operation of the Dragon Pearl.  Notice is also being provided to the *Twenty Largest*

10  *Creditors, Aircraft Finance and Aircraft Lease Parties, Other Parties Who Requested Service*

11  pursuant to *Order: Granting Motion for Entry of an Order Limiting Notice and Related Relief*

12  [Docket No. 225].  The Trustee submits that this constitutes sufficient notice of the Motion.

13  <u>**CONCLUSION**</u>

14    WHEREFORE, the Trustee respectfully requests that this Court:

15  (A)    grant the Motion;

16  (B)    order that the bankruptcy estate of Zetta PTE is substantively consolidated with the

17  estate of DPL *nunc pro tunc* to the Petition Date; and

18  (C)    reserve the Trustee's avoidance powers with respect to the DPL estate; and

19  (D)    grant such other and further relief as is appropriate and just under the circumstances.

20

21  DATED: April 28, 2021                **DLA PIPER LLP (US)**

22                  By: */s/ John  K. Lyons*
                      DAVID B. FARKAS
23                    JOHN K. LYONS (*Pro Hac Vice*)
                      JEFFREY S. TOROSIAN (*Pro Hac Vice*)
24

25                  Attorneys for Jonathan D. King as
                    Chapter 7 Trustee

26

27

28

DLA PIPER LLP (US)
LOS ANGELES

EAST\180177098.9

16